**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| GYLES G. WILSON, | CIVIL ACTION |
|---|---|
| v. | NO. 17-3701 |
| GRAYBAR ELECTRIC COMPANY INC., et al. | |

Baylson, J.                                                                                    March 14, 2019

## MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this case, this Court must determine whether genuine disputes of material fact prelude summary judgment on behalf of Defendants Graybar Electric Company, Inc. ("Graybar") and James O'Kane. Plaintiff Gyles Wilson initiated this suit alleging that he was wrongfully terminated from his position as Warehouse Supervisor at Graybar on the basis of age, disability, race, and national origin, and in retaliation for seeking workers' compensation and taking medical leave, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.; and the Pennsylvania Human Relations Act ("PHRA"), 42 P.S. § 951 et seq.

For the reasons discussed below, summary judgment for Defendants is granted in part and denied in part.

## I. UNDISPUTED FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from both parties' Statements of Fact and briefs, and are not genuinely disputed.

Plaintiff, a black man of Jamaican descent, spent twenty-three years working for Defendant Graybar.  (ECF 35-3, "Defs.' SOF" ¶¶ 1–2; ECF 39-2, "P's SOF" ¶¶ 1–4.)  Graybar first hired Plaintiff as a truck driver in Tampa, Florida in 2003.  (Defs.' SOF ¶ 3.)  In 2005, Plaintiff transferred to Graybar's Philadelphia branch and worked as an assistant to the Warehouse Supervisor.  (Id.)  The next year, when Plaintiff was over the age of forty, he was promoted to Warehouse Supervisor at the Philadelphia branch.  (Id. ¶ 4.)  Plaintiff's responsibilities included supervising warehouse personnel and incoming and outgoing shipping activity, maintaining security of merchandise, and ensuring that all warehouse procedures were followed.  (ECF 35, "Resp." Ex. C, "Wilson Tr." Ex. 19.) Defendant O'Kane was Plaintiff's supervisor from 2007 to 2014, and the two maintained a good relationship.  (Id. ¶¶ 7–8.)

### A.  Graybar's Disciplinary Policy

Graybar's "Corrective Action Process" includes four steps to improve an employee's performance, assuming that the employee has the ability to correct the performance deficiency. (P's SOF Ex. B, "Cook Tr." Ex. 1 ¶ 7.)

During Step One, which is a management consultation, an employee's immediate supervisor must meet with the employee to describe the performance/behavior observed, define the program and desired performance/behavior, gain the employee's commitment to improvement, and schedule a follow-up meeting usually no more than thirty days later.  (Id. ¶ 7.1.1.)

Step Two consists of a second meeting followed by a letter, termed a "Performance Improvement Plan Written Notice" ("Written Notice"), confirming the desired performance/behavior and a time frame for improvement.  (Id. ¶¶ 7.1.2, 7.1.2.1.)  During this time frame, the employee is not eligible for merit increases or promotions.  (Id. ¶ 7.1.2.2.)

Step Three, which occurs if the employee's behavior/performance has not improved within a "reasonable period of time," is a third meeting followed by a second Written Notice.  (<u>Id.</u> ¶ 7.1.3.)  During this third meeting, the manager should advise the employee that if his performance/behavior does not immediately improve, the employee will be terminated.  (<u>Id.</u>)  The employee is also not eligible for salary increases until the employee's manager is satisfied that his performance/behavior meets expectations.  (<u>Id.</u> ¶ 7.1.3.2.)

Step Four is termination.  (<u>Id.</u> ¶ 7.1.4.)  Termination may occur if all three steps of the corrective action process have been implemented and the employee's performance/behavior has not significantly improved, or if the employee fails to make a good faith effort to improve his performance.  (<u>Id.</u> ¶ 8.1.)  Even if all documentation of the circumstances leading to an employee's termination are not stored in the employee's personnel file, Graybar retains the right to take "the corrective action that it deems appropriate under the circumstances."  (<u>Id.</u> ¶ 8.2.1.)

## B.  Plaintiff's Disciplinary Record Through January 2015

Every year on September 1 from 2011 to 2016, Plaintiff received a merit-based increase in his annual salary.  (Resp. Ex. A.)  The reason provided in the spreadsheet documenting Plaintiff's salary increases is "merit."  (<u>Id.</u>)  In November 2014, Plaintiff completed a Graybar Management Training Program.  (Cook Tr. Ex. 2.)  The letter enclosing the certificate of completion states, "As a manager, your contributions play a key role in driving the success of the entire organization. . . . However, what we have given you are just tools; in order to be a truly successful manager, you must remember and utilize the information you had gained throughout the program."  (<u>Id.</u>)  And in 2015, Plaintiff earned a Graybar Safe Driver award.  (<u>Id.</u>)[1]

---

[1] The 2015 award is undated.

However, Monique Thornton Cook, Graybar's then-Director of Human Resources, testified that she met with O'Kane to discuss her concerns about Plaintiff's performance "multiple times" between the summer/fall 2014 through January 2015. (Cook Tr. at 49:2–18.) Plaintiff's first documented performance issue was in July 2014 and concerned Plaintiff's admitted failure to follow the scrap wire process outlined by O'Kane. In a July 31, 2014 email exchange between Plaintiff and O'Kane addressing this issue, Plaintiff states, "You are correct. Some of the steps were missed. Going forward I will pay closer attention the steps in the procedure you have outline [sic]." (Wilson Tr. Ex. 23.)

## C. January 2015 Management Consultation

On January 5, 2015, Plaintiff received his first corrective counseling at Graybar–Step One in Graybar's progressive discipline policy–for performance issues that dated back to July 2014. (Defs.' SOF ¶¶ 11, 12, 13.) The Written Notice, which Plaintiff did not sign, memorialized the corrective counseling session. (Wilson Tr. Ex. 20; P's SOF ¶¶ 11–16.) O'Kane described nine incidents in the notice, including the July 31, 2014 scrap wire incident, which took place on July 31 through December 30, 2014. (Wilson Tr. Ex. 20.) Examples of these incidents include the following:

7/31 - I had to address with Gyles why the warehouse was not handling the scrap wire process quarterly in accordance with our published instructions. This was noticed after I found some boxes of scrap wire in the warehouse. Giles agreed that he wasn't performing this process correctly. I had previously simplified the scrap wire instruction and sent it to Gyles to follow.

8/29 - Gyles emailed me asking if we should repair damage to one of our Graybar delivery trucks. When I looked further down the email chain, I noticed that the truck was put into the shop to remove the old company logo and have the current logo added. I had to ask Gyles why the damage wasn't properly noticed on the driver's pre-trip inspection and why he didn't notice the damage himself when he signed the report. Gyles claimed that he noticed it 'way back' but didn't want to send the truck to the shop for something that seemed small. The damage was actually significant, and I questioned why Gyles never reported the damage of

company property to myself. This was obviously caused by the driver striking something, and an accident investigation should have been completed. Gyles didn't have an explanation.

12/30 - We received a call from MJF stating that they were missing 1 of 2 skids of wire that we should have sent to them on 12/24. Gina Kenny pulled the ticket that she created to ship this wire as a result of an unrelated error on NJSC. She explained to Gyles on 12/23 that we were correcting a service failure and that it was important to get [a certain] property ticket delivered. The notes on that ticket were to deliver . . . 2 boxes/skids [identified][]. When we looked into this issue on 12/30, the ticket had Gyles [sic] hand writing stating '1 box on skid' and his initials on the selector line. The material was worth about $1,100 and we were told it was lost. The POD only showed 1 skid which would suggest that the 2nd skid never left the warehouse. Gina and I walked down the RSO isle and found the other skid of wire that should have been delivered to the customer on 12/24. We had to redeliver the material on 12/31.

(Wilson Tr. Ex. 20.) Aside from the December 30, 2014 issue, Plaintiff did not dispute any occurrences discussed during the January 5, 2015 meeting. (Id. ¶ 16.)

## D. September 2015 Written Notice

On September 9, 2015, Plaintiff first received and signed a Written Notice–Step Two of Graybar's progressive discipline policy. (P's SOF ¶¶ 19–22[2]; Defs.' SOF ¶ 19.) In this Written Notice, O'Kane described eleven examples of Plaintiff's performance or behavior from January to August 2015 that needed correction, including the following:

1/6/15- Gyles sent me an SG172 to junk some pipe which was damaged in the warehouse. Based on the amount of pipe being requested to junk, I looked deeper into the issue and found that damaged material was not being written up immediately after it was taken out of stock. Gyles' remedy was to review it "once per month" instead of weekly. Failure to write this material up as damaged immediately is against the warehouse manual and would cause inventory discrepancies. I explained to Gyles once again, the correct way to handle this.

7/31/2015- I received an invoice for warehouse supply which shoed the person ordering it as Anthony Harrigan. I had previously covered this topic with Gyles in

---

[2] Plaintiff admits that he received and signed the Written Notice but denies that this was the second step in Graybar's progressive discipline policy because he does not recall signing any documents pertaining to the verbal management consultation, the alleged first step. (P's SOF ¶¶ 19–22.)

2014, and instructed him that material handlers do not have the authorization to order warehouse supply. This particular task should be handled by the warehouse manager or supervisor. Gyles claimed that the supplier used the wrong employee name when the material was ordered.

8/11/2015- While reviewing the UPS signature sheet for the month, I noticed that many of the sections were either filled out wrong or were incomplete. Despite showing Gyles the expectation regarding his report, he continues to turn it in monthly with errors (no signature, nothing entered for some dates, etc). He also fails to check his work for compliance prior to turning it in. I had reviewed this similar issue twice with Gyles in the past.

8/20/2015- During the CSR huddle, some employees shared concern that the warehouse wasn't properly handling customer returns. I instructed them to bring any specific examples to me so I could review. On 8/24, a CSR brought me an example of a return that was delivered to our warehouse on 7/16 and was sitting on the shelf since 7/21. The RSO was rejected since it wasn't received in, however it was also not listed on the SG148 report that is sent weekly. According to Gyles, the employee who completes it didn't have time to complete on a weekly basis. Gyles wasn't even checking to make sure this was being completed, nor was he able to identify an issue and step in to correct it.

(Defs.' SOF ¶ 20; Wilson Tr. Ex. 24.)  The Written Notice warned Plaintiff that "if th[ese] or similar problems occur, continue or worsen, [his] employment with Graybar [could] be terminated." (Defs.' SOF ¶ 22; Wilson Tr. Ex. 24 at 3.)  The Written Notice also indicates that employees receive a second written notice before termination. (Wilson Tr. Ex. 24 at 1.)

**E. 2015 Performance Reviews**

In Plaintiff's Mid-Year Performance Review for the period ending June 30, 2015, O'Kane rated Plaintiff as "On Schedule" in the "Improving Profitability Through Service – Selecting" and "Safety" categories, but "Behind Schedule" in the "Performance" category. (Cook Tr. Ex. 9.) Although the period of review ended June 30, 2015, in the "Performance" category, O'Kane commented, "Although the warehouse performance is solid in this area, Gyles and I have discussed his own performance as outlined in the SG402 dated 9/9/2015. He and I will begin bi-weekly meetings to ensure improvements in this area." (Id.)

On March 11, 2016, Plaintiff received his 2015 Performance Evaluation, which was completed by O'Kane. (Defs.' SOF ¶ 54.) O'Kane's overall rating was "Inconsistent." (Id. ¶ 56; Wilson Tr. Ex. 27.) Though Plaintiff received a "Solid" rating under "Improving Profitability Through Service Selecting" and "Safety," Plaintiff received an "Inconsistent" rating in the "Passion" category and "Unsatisfactory" ratings in the "Customer Focus," "Developing Self and Others," "Problem Solving," and "Functional Expertise" categories. (Wilson Tr. Ex. 27.) In the "Functional Expertise" category, the Manager's Feedback states, "Based on the performance issues in 2015, it would appear that [Plaintiff] is struggling with the expectations of the job. We have discussed these problems together multiple times and the expectations are clear to [Plaintiff] yet little to no improvement has been made." (Id.) And under "Passion," the Manager's Feedback provides, "[Plaintiff] does not seem to have addressed many of the performance issues from 2015, and some have carried over into 2016 [,] which were discussed in early March when [Plaintiff] returned to duty. It would appear that [Plaintiff] does not embrace the challenges that come with his title of Warehouse Supervisor." (Id.)

### F. Graybar's Leave Policy

Graybar's Family or Medical Leave of Absence Policy provides, "To determine leave eligibility, [Graybar] uses a rolling 12-month period measured backward from the start of FMLA leave." (Defs.' SOF ¶ 68; ECF 35, "MSJ" Ex. F ¶ 5.1.) "All previous FMLA designated leave time during the 12-month period will be subtracted to determine remaining eligibility." (Defs.' SOF ¶ 69; MSJ Ex. F ¶ 5.1.)

### G. Plaintiff's November 2015–February 2016 Leave

From November 11, 2015 through February 22, 2016, Plaintiff took leave for treatment of back injuries that Plaintiff sustained during a fall in a parking lot during the winter of 2014. (Defs.'

SOF ¶¶ 27–28; P's SOF ¶ 28.)  Defendants received Plaintiff's request for FMLA leave on November 13, 2015, which noted that his expected return date was April 1, 2016.  (Cook Tr. Ex. 33.)  However, the FMLA certification from Plaintiff's healthcare provider, which was completed on November 25, 2015 and faxed to Defendants on December 1, 2015, indicated that Plaintiff would require two to three months of leave, and that his return date was unknown.  (Wilson Tr. Ex. 12.)

On January 9, 2016–eight weeks into Plaintiff's fourteen-week leave–O'Kane drafted and signed a "Request for New Hire/Replacement" form, which sought to replace Plaintiff because he "did not return to work following FMLA leave."  (ECF 46-1, "Cook Tr. Ex. 34".)[3]  The form was approved by O'Kane and Donald M. Wilkins, the Branch Manager, on January 9, 2016, and by Joe Sabatino, Graybar's Director of Operations, on January 10, 2016. (Id.)

After O'Kane, Wilkins, and Sabatino approved the form, O'Kane emailed Cook to discuss Plaintiff on February 3, 2016.  (Id.)  Cook responded that she had it on her calendar to speak with O'Kane about Plaintiff the following week.  (Id.)  The next week, on February 8, 2016, O'Kane asked Cook if he could move forward with the replacement form because he "ha[d] not heard anything back from [Plaintiff] regarding his return to work."  (Id.)  On February 11, 2016, Richard Harvey emailed Annmarie Gualberto, copying Cook, O'Kane, and Sabatino, attaching the form and writing, "This was signed in January by all parties but I received today?"  (Id.)  Harvey, the "DVP," approved the form that day–approximately thirteen weeks into Plaintiff's leave.  (Id.)  Though this request was approved, Plaintiff was not terminated.

---

[3] Exhibit 34 to Cook's deposition transcript does not provide the full email exchange. Defendants attached a complete copy of the document as an exhibit to the Motion for Leave to Supplement the Record on November 19, 2018 (ECF 46).  The Court granted this Motion on November 21, 2018 (ECF 49).

Plaintiff was cleared to return to work with no restrictions on February 22, 2016. (Defs.' SOF ¶ 30.) Plaintiff did not collect workers' compensation benefits during his leave,[4] and he was unpaid for many days during his leave period, including at least on December 24, 2015 through January 29, 2016. (P's SOF ¶ 27; Defs.' SOF ¶ 43.)

Prior to Plaintiff's leave, on November 9, 2015, Plaintiff requested a demotion to warehouse lead in Philadelphia, or a change to any available position, including warehouse lead, driver, or packer, in Florida. (P's SOF ¶¶ 31–33.) Plaintiff asked O'Kane about a demotion "two or three times over a period of two years" prior to his termination. (P's SOF ¶ 33.) Upon Plaintiff's return from leave, Plaintiff did not request lighter duties. (Defs.' SOF ¶ 31.) From the time Plaintiff returned to work through the time Plaintiff was terminated, there were no openings for warehouse lead positions. (Id. ¶ 33.) Although O'Kane was supportive of Plaintiff's request to transfer to the Florida branch, Plaintiff did not transfer because there were no vacancies. (Id. ¶¶ 34–35.)

## H. Graybar's Accident Policy

Graybar's Accident and Injury Investigation Policy provides that "[a]ll work related injuries and/or accidents must be reported to your supervisor immediately." (Wilson Tr. Ex. 9 at 1.) An employee involved in a vehicle accident is required to report the incident to his immediate supervisor using a "First Notice of Incident Form" referred to as form "SG-174."). (Id.) After the employee involved in the accident completes Section A of the form, he or she must immediately forward the form to his supervisor. (Id.) The employee's supervisor must complete Section B of the form, print the form, and require the employee to sign the form in Section A unless the nature

---

[4] Plaintiff contends that he requested workers' compensation benefits, but that Defendants denied his request because he did not report his winter 2014 fall until March 2016. (P's SOF ¶ 43.)

of the injury is such that the employee is unable to sign.  (Id.)  The SG-174 requires the supervisor to then immediately review Section 7.2.5 of Graybar's Drug and Alcohol Policy to determine if drug/alcohol testing is required.  (Wilson Tr. Ex. 10, at 2.)

Section 2.5.1 of the Drug and Alcohol Policy provides that "[w]here an employee's performance either contributed to an accident . . . or cannot be completely discounted as a contributing factor to an accident or injury, the employee shall be subject to drug and/or alcohol testing." (Defs.' SOF ¶ 93; MSJ Ex. G ¶ 7.2.5.1).  Further, any employee involved in a motor vehicle accident while on Company business in a rented vehicle, which results in property damage, must be submitted to drug and alcohol testing.  (Defs.' SOF ¶ 94; MSJ Ex. G ¶ 7.2.5.2(c).)  Only the Director of Human Resources can make exceptions to this policy.  (Defs.' SOF ¶ 92; MSJ Ex. G ¶ 7.2.5.2.)  Plaintiff testified that he understood that O'Kane, Plaintiff's supervisor, would make this determination.  (Wilson Tr. 95:22–25.)

Where the SG-174 form is used to report a vehicle-related incident, the supervisor is required to email the form to the Director of Human Resources and the Director of Finance within 24 hours of notification of the incident.  (Wilson Tr. Ex. 9.)  Where the employee does not suffer any injuries from a vehicle accident, the supervisor is responsible for completing an SG-389 Graybar Vehicle Accident Investigation Report and investigating the accident after initial notice has been made using the SG-174 form.  (Id. at 1–2.)

### I.  Plaintiff's March 2016 Injury Reports

Although Plaintiff told other Graybar employees of his injuries shortly after the fall occurred in late 2014, he did not report the fall to Graybar until March 2, 2016, during a performance meeting with Sabatino and O'Kane.  (Defs.' SOF ¶ 29; P's SOF ¶ 29.)  Plaintiff completed a SG-174 to report his injury on March 4, 2016.  (Wilson Tr. Ex. 3.)  The form indicates

that Plaintiff did not report the injury to Graybar sooner because "as far as [Plaintiff] could tell nothing broken [sic] and it was not the first time that [he] fell." (Id.) Further, Plaintiff noted that as the Warehouse Supervisor, he "encourages all of [his] Direct[] [reports] to report all incidents to [him] regardless of how small it is [sic]," but conceded that "he fails to apply the same rule when it comes to [his] personal health." (Id.) As a result, Plaintiff explained, "After the fact, I did not report it to Jimmy [O'Kane] because I know that I would be written up for not following the company's procedure and and [sic] try to have it fix [sic] without missing any days from work." (Id.) Plaintiff was prescribed anti-inflammatory pain killers, attended physical therapy, and received spinal injections to treat his injury. (Id.) As of March 4, 2016, Plaintiff was "pain free and off all medications." (Id.) Defendants denied this workers' compensation claim "due to reporting outside of the guidelines." (Cook Tr. Ex. 36.)

Plaintiff completed a second SG-174 form on March 3, 2016, which reported that he "could hardly get out of bed" after replacing damaged racks in the warehouse the day before. (Defs.' SOF ¶ 36; Wilson Tr. Ex. 4.) On the morning of March 3, Plaintiff reported the incident to O'Kane, who sent Plaintiff to Healthmark, a medical clinic used by Graybar employees, that day. (Id. ¶ 37; Wilson Tr. Ex. 4.) Plaintiff was instructed to take Motrin if he continued to experience back pain, which he did. (P's SOF ¶ 37; Wilson Tr. Ex. 4.) Plaintiff was cleared to return to full duty the same day. (P's SOF ¶ 38; Wilson Tr. Ex. 4.) Plaintiff did not lose any time on the job, and Plaintiff was not told by any medical provider that his job should be modified as a result of the incident. (Defs.' SOF ¶¶ 41–42.)

After the incident, Defendants instructed Plaintiff to stretch before each shift, and to ask for assistance when heavy lifting may be required, to fulfill his job responsibilities. (Id. ¶ 44.) Wilson did not stretch or seek assistance with heavy lifting, but he did take Motrin for back pain,

as instructed by his physician.  (Id. ¶ 45; P's SOF ¶¶ 44–45.)  Plaintiff also did not collect workers' compensation benefits after this incident.  (Defs.' SOF ¶ 53; P's SOF ¶ 53.)

**J.  March–August 2016 Performance Issues**

In an April 20, 2016 email, O'Kane asked Plaintiff to "investigate and advise" as to why sixty-three deliveries year-to-date were missing signatures on delivery reports.  (P's SOF ¶ 61; Defs.' SOF ¶ 61; Wilson Tr. Ex. 28.)  And in June 2016, Wilson left thirty minutes early from work without permission to attend a doctor's appointment.  (Defs.' SOF ¶ 62; P's SOF 62.)  On June 15, 2016 at 10:40 A.M., Plaintiff emailed O'Kane a Graybar Vehicle Accident Investigation Report for a June 7, 2016 incident.  (Wilson Tr. Ex. 29.)  At 2:38 P.M., O'Kane emailed himself a note listing errors on the report and stating, "It appeared he put zero effort into the investigation and I had to have him re-do it."  (Id.)

**K.  Plaintiff's August–October 2016 Leave**

On or around August 2, 2016, Plaintiff requested medical leave for prostate cancer treatment.  (Cook Tr. Ex. 19.)  Graybar initially provided Plaintiff with a Notice of Eligibility and Rights & Responsibilities (FMLA) form conveying that he was eligible for FMLA leave.  (Id.) However, on August 2, Graybar clarified that Plaintiff exhausted his FMLA leave entitlement in February 2016.  (Id.)

Notwithstanding, Graybar granted Plaintiff paid medical leave from August 15, 2016 through October 3, 2016 for prostate cancer treatment, during which time Graybar provided him with short-term disability benefits equal to his full salary.  (Defs.' SOF ¶ 71.)  In a letter dated September 19, 2016, Plaintiff's care management team at the Cancer Treatment Centers of America stated that he was fit for duty and could return to work with no restrictions on October 3, 2016.  (Wilson Tr. Ex. 18.)  Wilson testified that his cancer has been in remission since his surgery,

which took place prior to October 3, 2016.  (Defs.' SOF ¶ 72; Wilson Tr. at 113–14.)  Plaintiff did not receive chemotherapy or radiation for his cancer.  (Defs.' SOF ¶ 73.)

**L.  November 4, 2016 Truck Incident**

As Warehouse Supervisor, Plaintiff supervised five Graybar drivers, including delivery driver Bob O'Donnell.  (Defs.' SOF ¶¶ 78–79.)  On Friday, November 4, 2016, O'Donnell was involved in an accident while driving a Ryder rental truck during work hours.  (Id. ¶ 80.)  It was reported to Plaintiff between 1:00 and 3:00 P.M. that day that O'Donnell returned to the Graybar warehouse with a hole in the rental truck.  (Id. ¶ 82.)

When Plaintiff confronted O'Donnell, O'Donnell stated that he did not know what caused the hole, but that it may have been caused by a tree.  (Id. ¶ 83.)  At 5:08 P.M., Plaintiff emailed O'Kane to report the incident, stating, "Bob reported to me that he was parking his truck here in the yard when Harry pointed out to him that he has a hole in the box of his truck.  He said he not [sic] remember when he had hit a low hanging tree."  (Wilson Tr. Ex. 6.)  At 5:19 P.M., O'Kane responded by stating, "Per my conversation, I have an issue with the fact that you didn't bring this to my attention until after 5pm when the employee reported it to you at 1:30 today.  You and I have spoken before about the need to report any incident regarding a vehicle accident to my attention right away.  In addition to that, we need to have the employee drug tested."  (Wilson Tr. Ex. 8.)  O'Kane requested that Plaintiff send him a completed SG-174 form, along with other documents, "first thing Monday morning."  (Id.)  Plaintiff emailed O'Kane the SG-174 form, in addition to the other documents requested, at 12:51 P.M. on Monday, November 7, 2016.  (Id.)  Plaintiff testified that although the SG-174 form is dated November 4, 2016, it was not completed until November 7.  (Wilson Tr. at 93:3–7.)

Plaintiff testified that this incident was "the only time he could recall that [a vehicle accident] was not [reported] the same day. (Id. at 88:19–89:6.) Plaintiff also testified that this was the only incident he could "recall not following the procedure" by failing to require drug testing. (Wilson Tr. at 101:2–11.)[5]  However, per O'Kane's instructions, Plaintiff instructed O'Donnell to submit to a drug test on November 7, which O'Donnell failed, leading to his termination. (Defs.' SOF ¶¶ 97–98.)

**M. Plaintiff's Termination**

Plaintiff was terminated on November 10, 2016 in a meeting with O'Kane and Sabatino. (Defs.' SOF ¶ 101; Cook Tr. at 39:14–18.)[6]  Plaintiff testified that the meeting lasted only thirty seconds because as soon as he was told that he was fired, he left. (Id. at 145:13–17.) Plaintiff assumed he was fired because of "the truck incident," but during the meeting, he was only told that "[his] service [was] no longer needed." (Id. at 146:4–12.)

Cook, Sabatino, and O'Kane were involved in the decision to terminate Plaintiff. (Id. ¶ 102.) Cook and O'Kane testified that they decided to terminate Plaintiff because he failed to report the November 4 truck accident. (Cook Tr. 31:2–5; Resp. Ex. D, "O'Kane Tr." at 121:4–6; Defs.' SOF ¶ 103.) Cook further testified that the decision was made because of the severity of the

_____

[5] Plaintiff contends that this testimony should not be considered because Plaintiff was responding to a confusing question to which Plaintiff's counsel objected. (P's SOF ¶ 100.) However, the transcript indicates that Plaintiff's counsel objected to the subsequent question, not the question to which Plaintiff responded, "As far as I recall, this is only incident that I said that I did not drug test because of the prior driver. That's what I can recall not following the procedure." (Wilson Tr. at 101:2–11.) Defendants argue that Plaintiff has failed to articulate why this question was confusing, and that a general objection does not create a factual dispute on summary judgment. (ECF 44, "Rep." at 3 n.2.) The Court concludes that it will consider Plaintiff's testimony in ruling on the instant motion.

[6] Cook testified that she was not involved in the meeting, but Plaintiff testified that Cook was present, although she did not say anything. (Compare Cook Tr. at 39:14–18, with Wilson Tr. at 145:13–17.)

November 4 incident, which was compounded by "everything else that was documented" with respect to Plaintiff's performance to date. (Cook Tr. at 58:3–9.)

In Cook's testimony, she conceded that Plaintiff was terminated after Step Two in Graybar's progressive discipline policy; that is, before Plaintiff received a second Written Notice. (Id. at 65:19–22.) Cook stated that a second Written Notice had been written for Plaintiff and was ready to be issued to him, but that after Plaintiff failed to properly report the November 4 incident, Cook decided to terminate Plaintiff rather than provide him with a final warning. (Id. at 65:23–66:9.)

O'Kane discussed Plaintiff's termination in a November 10, 2016 email to himself, in which he wrote, "Per [Cook's] direction, we held a meeting on 11/10/16 at 9am. We simply met with [Plaintiff] and talked through the termination without handing him a write up. The term[ination] was based on the attached performance issues." (O'Kane Tr. Ex. 31.)[7]

The attached Written Notice includes a handwritten note documenting Plaintiff's two leaves of absence, and indicates that it was the second Written Notice in Graybar's progressive discipline policy. (Id.) The Written Notice references the January 5, 2015 consultation and the September 9, 2015 Written Notice, and describes the November 4, 2016 incident as well as incidents that occurred in March, April, May, and June 2016. (Id.) O'Kane describes the November 4, 2016 truck incident in the Written Notice as follows:

> [O]ne of our drivers reported an incident to you regarding significant damage to a delivery vehicle. The incident was brought to your attention at approximately 1:30pm on Friday 11/4/16, but you failed to mention it to me until after 5pm. At that time, you simply sent me an email with a picture of the damage. You and I spoke multiple times between the hours of 2pm and 5pm, yet you decided not to tell me about the incident. More importantly, you failed to follow the company's instructions regarding how to report an accident which would include an SG-174

---

[7] Ex. 31 to O'Kane's deposition transcript is not the full and complete version of the document. Plaintiff provided a complete copy at oral argument on February 13, 2019. (ECF 55.)

and post-accident testing.  This is not the first time you failed to properly report an incident in a timely fashion.  In March of 2016, you reported an incident from 2014 during a performance review meeting with the Director of Operations and myself. During that meeting, we discussed the importance of timely notification and adherence to our policies regarding this topic.

(Id.)  The Written Notice also indicates that it was a "final written warning" and if the performance problems continued, his employment could be terminated.  (Id.)

At the time of Plaintiff's termination, he was fifty-five years old.  (Compl. ¶ 40.) Defendants hired a twenty-five-year-old to replace Plaintiff as Warehouse Supervisor.  (P's SOF ¶ 120.)

## II.  PROCEDURAL BACKGROUND

Plaintiff filed the original Complaint in this Court on August 17, 2017 (ECF 1).   After Defendants filed a partial Motion to Dismiss on October 23, 2017 (ECF 7), and Plaintiff filed a Response on November 6, 2017 (ECF 12), Plaintiff filed the First Amended Complaint on November 13, 2017 (ECF 13).  On November 27, 2017, Defendants again filed a partial Motion to Dismiss (ECF 15).  When Plaintiff filed a Second Amended Complaint on January 9, 2018 (ECF 21, "Compl."), the Court denied Defendants' partial motions to dismiss as moot on the same day (ECF 20).  The Second Amended Complaint alleges ten Counts:

1.  **Count I**: Discrimination under the ADA against Defendant Graybar;

2.  **Count II**: Discrimination based on actual or perceived disability under the PHRA against both Defendants;

3.  **Count III**: Workers' compensation retaliation under the PHRA against both Defendants;

4.  **Count IV**: Discrimination due to race, color, and national origin under Title VII against Defendant Graybar;

5.  **Count V**: Discrimination due to race, color, and national origin under the PHRA against both Defendants;

6. **Count VI**: Discrimination under the ADEA against Defendant Graybar;

7. **Count VII**: Discrimination due to age under the PHRA against both Defendants;

8. **Count VIII**: Retaliation under the FMLA against both Defendants;

9. **Count IX**: Interference under the FMLA against both Defendants; and

10. **Count X**: Wrongful discharge of employment against both Defendants.

On January 23, 2018, Defendants filed a partial Motion to Dismiss the Second Amended Complaint (ECF 22), which the Court denied on March 26, 2018 (ECF 25, 26). Defendants then filed an Answer to the Second Amended Complaint on April 9, 2017 (ECF 27). On October 1, 2018, Defendants filed a Motion for Summary Judgment on all Counts in the Second Amended Complaint (ECF 35).

Plaintiff filed a Response on October 29, 2018 (ECF 39, "Resp."). Plaintiff has withdrawn Counts IV, V, and IX–the race, color, and national origin discrimination claims under Title VII and the PHRA and the FMLA interference claim–"based on discovery and investigation to date." (Resp. at 26, 33.)

Defendant filed a Reply on November 19, 2018 (ECF 44), and Plaintiff filed a Sur-Reply on December 3, 2018 (ECF 53, "Sur-Rep."). The Court held oral argument on the Motion for Summary Judgment on February 13, 2019 (ECF 55). The parties submitted letters in support of their positions on February 15, 2019 (ECF 56).[8]

Due to Plaintiff's voluntary withdrawal of Counts IV, V, and IX, the Court considers whether summary judgment is appropriate only on Counts I, II, III, VI, VII, VIII, and X.

---

[8] Defendants' letter does not appear on the docket.

## III. LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Id. at 255.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue for trial." Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts."). Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## IV.    DISCUSSION

### A. Disability Discrimination Claims (Counts I and II)–Summary judgment is granted as to Plaintiff's PHRA claim, and denied as to Plaintiff's ADA claim.

Counts I and II allege disability discrimination under different statutory frameworks; Count I alleges discrimination under the ADA, and Count II alleges discrimination under the PHRA.  The ADA prohibits "discriminat[ion] against a qualified individual on the basis on disability in regard to . . . the hiring, advancement, or discharge of employees[.]" 42 U.S.C. § 12112(a).  Similarly, the PHRA makes it unlawful, in relevant part, "[f]or any employer because of the . . . non-job related handicap or disability . . . of any individual or independent contractor, . . . to discharge from employment such individual or independent contractor, . . . if the individual or independent contractor is best able and most competent to perform the services required."  43 P.S. § 955(a).

Both of Plaintiff's disability discrimination claims are subject to the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and can be analyzed together.[9]  Oden v. SEPTA, 671 F. App'x 859, 862 n.4 (3d Cir. 2016) (quoting Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012) (explaining that the ADA and PHRA are "'to be interpreted consistently' and 'have the same standard for determination of liability'")); Buskirk v. Apollo Metals, 307 F.3d 160, 166 n.1 (3d Cir. 2002) (citations and internal quotation marks omitted) (noting that because the PHRA and the ADA are "basically the same . .

---

[9] Plaintiff contends that the McDonnell Douglas framework does not apply because the record includes direct evidence of discrimination, not just circumstantial evidence.  (Resp. at 14.)  To qualify as direct evidence of discrimination, "the evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."  Walden v. Georgia-Pac. Corp., 126 F.3d 506, 513 (3d Cir. 1997) (citation and internal quotation marks omitted).  However, as Plaintiff's termination was premised on performance issues, the McDonnell Douglas test applies.  See Munoz v. Nutrisystem, Inc., No. 13-4416, 2014 WL 3765498, at *4 n.5 (E.D. Pa. July 30, 2014) (Restrepo, J.) ("Because the termination was premised on attendance, . . . not on [plaintiff's] disabilities directly, [plaintiff's] argument does require an inference of discriminatory animus.").

. in relevant respects[,] Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts").

Under this framework, Plaintiff must first establish a prima facie case of disability discrimination. McDonnell Douglas, 411 U.S. at 802. To make out a prima facie case, a plaintiff must demonstrate: (1) "he is a disabled person within the meaning of the ADA"; (2) "he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) "he has suffered an adverse employment decision as a result of discrimination." Gaul v. Lucent Techs., Inc., 134 F. 3d 576, 580 (3d Cir. 1998). At summary judgment, "the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citation and internal quotation marks omitted).

Second, if the employee is successful in establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action at issue. McDonnell Douglas, 411 U.S. at 802–03. Third, if the employer successfully puts forth such a reason, the burden shifts back to the employee to prove that the employer's explanation is merely a pretext for the employment discrimination. Id. at 804–05. Even though "the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)); see also Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (citations omitted) ("Throughout this burden-shifting exercise, the burden of persuasion, 'including the burden of proving but for causation or causation in fact, remains on the employee.'").

The PHRA and the ADA "are interpreted identically, except where there is something specifically different in the PHRA's language requiring that it be treated differently." Wilson v. Iron Tiger Logistics, Inc., 628 F. App'x 832, 835 (3d Cir. 2015) (citing Fasold v. Justice, 409 F.3d 178, 184 n.8 (3d Cir. 2005)). The relevant distinction between the PHRA and the ADA in this case is the definition of "disabled." This distinction requires a separate analysis under each statute.

### i. Factual issues preclude summary judgment on Plaintiff's ADA claim.

The parties do not dispute that Plaintiff was otherwise qualified for his position as Warehouse Supervisor or that Plaintiff suffered an adverse employment decision when he was terminated. At issue is whether Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether his back injury or cancer qualified as a "disability" under the ADA at the time of his termination.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). A "major life activity . . . includes the operation of a major bodily function, including but not limited to, functions of the immune system [and] normal cell grown[.]" Id. § 12102(2)(B). This definition incorporates the 2008 amendments to the ADA enacted as part of the ADA Amendments Act ("ADAAA"), which "expand[ed] the definition of disability to include a range of symptoms . . . characteristic of cancer and other diseases." Alston v. Park Pleasant, Inc., 679 F. App'x 169, 172 (3d Cir. 2017). Under the ADAA, "an impairment that is . . . in remission, is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Accordingly, the Third Circuit has instructed that "cancer can–and generally will–be a qualifying disability under the ADA." Alston, 679 F. App'x at 172.

Though the ADAAA relaxed the definition of disabled under the ADA, "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." Id. (quoting 29 C.F.R. § 1630.2(j)(1)(iv)). In making this assessment, courts require "some evidence of the plaintiff's substantial limitation–even when the limitation seems self-evident in context." Alston, 679 F. App'x at 172 (affirming grant of summary judgment where the plaintiff failed to allege that her breast cancer diagnosis substantially limited any major life activity); but see Carroll v. Comprehensive Women's Health Servs., No. 3:16-cv-1509, 2017 WL 4284386, at *4 (M.D. Pa. Sept. 27, 2017) (concluding that plaintiff's cancer, which was in remission, was a disability under the ADA because "[i]t is axiomatic that cancer literally is abnormal cell growth," and so "[c]ancer qualifies as a disability").

Here, Defendants argue that Plaintiff cannot establish that he is "disabled" under the ADA– the first prong of the prima facie case–because the record shows that Plaintiff's "major life activities" were not "substantially limited" at the time of his termination. (MSJ at 10–11.) Defendants emphasize that Plaintiff was terminated more than seven months after he was able to return to work with no restrictions following his first leave of absence on February 22, 2016, and over one month after Plaintiff was cleared to return to work following his second leave of absence on October 3, 2016. (MSJ at 10–11.)

With respect to Plaintiff's back injury, Plaintiff contends that this was an active injury when he was terminated in November 2016 because when he re-injured his back in March 2016, Plaintiff was instructed not to lift heavy objects without help and to stretch before each shift for an indefinite period of time. (Resp. at 17.) Plaintiff argues that he initially took leave when he sustained a "ligament sprain/strain of his lumbar spine, resulting in radiating pain to his legs and muscle spasms." (Compl. ¶ 21.) However, the record reflects that as of March 4, 2016, Plaintiff

was "pain free and off all medications." (Wilson Tr. Ex. 3.) And on March 3, 2016, after Plaintiff re-injured his back replacing damaged wracks in the warehouse, the physician at Healthmark cleared Plaintiff to return to work the same day without limitations, and Plaintiff concedes that he did not lose any time on the job because of his injury. (P's SOF ¶ 38; Wilson Tr. Ex. 4.) Therefore, Plaintiff fails to establish that his back injury amounted to a "disability" within the meaning of the ADA at the time of his termination.

Regarding his cancer diagnosis, Plaintiff argues that his prostate cancer was a disability when he was terminated in November 2016 even though it was in remission as of October 2016. (Resp. at 16–17.) In the Response, Plaintiff contends that because his cancer was considered "active" at the time of his termination, "the aforementioned symptoms substantially limit major life activities (*e.g.*, impairment of [Plaintiff's] bladder and reproductive functions and normal cell growth)." (Id. at 17.) [10] During oral argument, Plaintiff stated that he testified about his cancer

---

[10] The parties do not cite, and the Court is unaware of, any precedential judicial decisions holding that cancer in remission is necessarily a "disability" under the ADA even if a plaintiff does not allege that he or she personally experienced a substantial limitation on a major life activity.

Judges within this Circuit, however, disagree over whether cancer in remission is always a disability under the ADA because it necessarily limits the substantial life activity of normal cell growth. See Carroll, 2017 WL 4284386, at *4 (denying summary judgment on the plaintiff's ADA claim where the plaintiff's cancer, which was in remission, qualified as a disability without evidence of significant limitations on her major life activities); Unangst v. Dual Temp Co., Inc., No. 10-6811, 2012 WL 931130, at *4 (E.D. Pa. Mar. 19, 2012) (Surrick, J.) (citation omitted) (concluding that the plaintiff's cancer, though in remission when he was laid off, was a disability under the ADA in part because "[t]he ADA was clearly intended by Congress to protect cancer patients from disability discrimination"); but see Chalfont v. U.S. Electrodes, No. 10-2929, 2010 WL 5341846, at *8 (E.D. Pa. Dec. 28, 2010) (Padova, J.) (concluding that the plaintiff's cancer, which was in remission at the time of his termination, was a disability because the plaintiff adequately alleged that his cancer, when active, "at times cause[d] him to be fatigued and subject to easy bleeding and bruising" and substantially limited "the major life activity of normal cell growth and circulatory function").

diagnosis and resulting hospital stay.[11] The Court concludes that facts relating to whether Plaintiff's cancer is a disability under the ADA are in dispute and the sufficiency of inferences from Plaintiff's briefing and testimony are best decided by a jury at trial. Because there are genuine issues of material fact concerning Plaintiff's prima facie case, the Court need not address the remaining steps of the McDonnell Douglas framework.[12]

### ii. There is no genuine dispute that Plaintiff was not disabled under the PHRA.

Pursuant to the ADAAA, the definition of "disabled" under the ADA is "more relaxed" than under the PHRA. McGlone v. Phila. Gas Works, No. 15-3262, 2017 WL 659926, at *5 (E.D. Pa. Jan. 19, 2017) (Baylson, J.) (citation omitted); see also Szarawara v. Cty. of Montgomery, No. 12-5714, 2013 WL 3230691, at *2 (E.D. Pa. June 27, 2013) (Baylson, J.) (citation omitted) (noting that "[t]he ADAAA relaxed the ADA's standard for disability, but the PHRA has not been similarly amended").

The same standard applies to determine disability under the PHRA and the ADA. However, judges in this Circuit have noted that unlike the ADA, "the PHRA contains no provision

---

[11] The transcript of Oral Argument on February 13, 2019 will reveal further discussion of this issue.

[12] Though the Court does not address pretext in ruling on the Motion for Summary Judgment, the Court notes that the record reflects a factual dispute over why Plaintiff was terminated. Cook testified that Plaintiff was terminated after Step Two in Graybar's progressive discipline process; that is, before Plaintiff received a second Written Notice. (Cook Tr. at 65:19–22.) Cook stated that a second Written Notice had been completed and was ready to be issued to Plaintiff prior to his termination, but that Cook changed her mind in light of the November 4 incident and decided to terminate Plaintiff rather than provide him with that final Written Notice. (Id. at 65:23–66:9.) The reasonable inference is that the second Written Notice was written and completed before the November 4 incident. However, the second Written Notice includes a description of the November 4 incident, indicating that it was drafted after the incident. (O'Kane Tr. Ex. 31.) Instructions regarding the inconsistency between the draft Written Notice and Cook's testimony may be submitted to the jury. While there is no dispute that Plaintiff testified that he violated Graybar's procedures in connection with the November 4 incident, a reasonable jury could conclude that Plaintiff's termination was motivated by discriminatory animus.

analogous to the ADAAA's rule of construction regarding impairments that are episodic or in remission." Showers v. Endoscopy Ctr. of Cent. Pa., LLC, 58 F. Supp. 3d 446, 462 (M.D. Pa. 2014) (citing 43 Pa.C.S. § 954); see also Carroll, 2017 WL 4284386, at *5 (citation and internal quotation marks omitted) ("[D]efendants are correct in arguing that cancer does not, in and of itself, entitle [plaintiff] to protection under the PHRA[.]").

Plaintiff contends that his back injury and prostate cancer are also disabilities under the PHRA. As Plaintiff has failed to demonstrate that his back injury was a disability at the time of his termination under the less stringent ADA, Plaintiff's back injury does not amount to a disability under the PHRA. Plaintiff's cancer, which has been in remission at least since October 2016, also does not amount to a disability under the PHRA. As noted above, unlike the ADA, which includes provisions regarding impairments that are in remission, the PHRA has no similar provision. See Showers, 58 F. Supp. 3d at 462. Therefore, Plaintiff's cancer was not a disability under the PHRA at the time of his termination, and summary judgment will be granted on Plaintiff's disability discrimination claim under the PHRA.

### iii. There is no genuine dispute that Plaintiff was not "regarded as" disabled under the ADA or PHRA.

Plaintiff has alleged in the alternative that he was terminated because Defendants perceived him to be disabled because of his back injury.[13] Even if a plaintiff is not actually disabled, the plaintiff can establish "disability" under the ADA and PHRA by demonstrating that he was terminated because the defendants regarded him as having a limiting impairment. See Macfarlan,

---

[13] As the Court has concluded that there is no genuine dispute that Plaintiff's cancer was an actual disability under the ADA, the Court does not address Plaintiff's alternative argument that he was "regarded as" disabled. See Macfarlan, 675 F.3d at 274 (stating that to establish "disability" under the ADA or PHRA, "a plaintiff may demonstrate any one of: an actual mental or physical impairment that substantially limits one or more major life activities, a record of such impairment, or that his employer regarded him as having a disability").

675 F.3d at 274; <u>Gress v. Temple Univ. Health Sys.</u>, No. 13-CV-5414, 2018 WL 3970436, at *6 (E.D. Pa. Aug. 20, 2018) (Ditter, J.), <u>appeal filed</u>, No. 18-3085 (3d Cir. Sept. 20, 2018).

A plaintiff is "regarded as" disabled if he is "subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantial limit, a major life activity." 42 U.S.C. § 12102(3)(A). To establish disability through this avenue, "the plaintiff must demonstrate that the employer believed that a wholly unimpaired plaintiff had an impairment that substantially limited at least one major life activity or that the employer believed an employee's actual impairment to limit major life activities when it in fact did not." <u>Fagan v. Elwyn Inc.</u>, No. 17-393, 2017 WL 3456528, at *3 (E.D. Pa. Aug. 11, 2017) (Baylson, J.) (quoting <u>Macfarlan</u>, 675 F.3d at 274).

To prove a "regarded as" claim, "it does not suffice for a plaintiff to merely show that his employer perceived him to be impaired." <u>Siegfried v. Lehigh Valley, Dairies, Inc.</u>, No. 02-cv-2951, 2003 WL 23471747, at *10 (E.D. Pa. Oct. 29, 2003) (Baylson, J.). Rather, a plaintiff "must also show that his employer perceived such impairment as substantially limiting his ability to work." <u>Id.</u> To establish that Defendants believed Plaintiff to be substantially limited in the life activity of working, Plaintiff must demonstrate that Defendants "misinterpret[ed] information about an employee's limitations to conclude that the employee is incapable of performing a wide range of jobs." <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 381 (3d Cir. 2002); <u>cf.</u> <u>Siegfried</u>, 2003 WL 23471747, at *11 (granting summary judgment on the plaintiff's ADA and PHRA claims where the defendant regarded the plaintiff, who formerly held a position requiring arduous physical labor, as able to perform clerical work and light to moderate physical work in another role).

A plaintiff cannot demonstrate that he was "regarded as" disabled if the impairment is "'transitory or minor,' which means it has an 'actual or expected duration of six months or less.'" Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 259 (3d Cir. 2014) (citation omitted). "Whether an impairment is 'transitory and minor' is to be determined objectively." Id. (citation omitted). In other words, "the relevant inquiry is whether the impairment that the employer perceived is an impairment that is objectively transitory and minor." Id.; see, e.g., id. at 259–60 (holding that the plaintiff's broken finger was objectively transitory and minor).

Regarding Plaintiff's back injury, Plaintiff avers that Defendants viewed him as disabled after March 2016 because O'Kane instructed him not to lift heavy objects by himself, and to stretch before each shift, for an indefinite period of time. (Resp. at 17.) Further, Plaintiff argues that in a March 17, 2016 email exchange between Cook and Ben Rothmel, Graybar's Director of Employment Practices and Policy, Rothmel and Cook acknowledged that Graybar perceived Plaintiff as disabled. (Id.) In that email, Rothmel writes, "I would still proceed cautiously in that he was recently out on leave and could qualify as disabled." (Cook Tr. Ex. 36.) Cook responds, "My thinking exactly." (Id.)

These facts do not, on their own, demonstrate that Defendants regarded Plaintiff as disabled at the time of his termination. As the Third Circuit has instructed, "[t]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled or that the perception caused the adverse employment action." Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996).[14] To withstand summary judgment, "Plaintiff must

---

[14] Though Kelly was issued before the ADAAA, this principle has been cited with approval in a non-precedential Third Circuit decision after the ADAAA's enactment. See Cunningham v. Nordisk, 615 F. App'x 97, 100 (3d Cir. 2015) (holding that the plaintiff was not "regarded as" disabled even though her co-workers and supervisor were aware of her medical condition, and affirming grant of summary judgment on the plaintiff's ADA claim). Judges in this District have

do more than present evidence that h[is] supervisor regarded h[im] as 'somehow disabled.'" Anderson v. Radio One, Inc., No. 09-194, 2010 WL 3719088, at *10 (E.D. Pa. Sept. 20, 2010) (Goldberg, J.) (quoting Ross v. Kraft Foods N. Am., Inc., 347 F. Supp. 2d 200, 204 (E.D. Pa. 2004) (Brody, J.)); see, e.g., Ross, 347 F. Supp. 2d at 204 (granting summary judgment where the plaintiff's only evidence that he was "regarded as" disabled was that a supervisor said to him, "[W]ith your kind of disability you should not be working here"). "[S]tray remarks from co-workers, even those implicating an employee's disability . . . are not alone sufficient to raise the critical inference" on summary judgment. Anderson, 2010 WL 3719088, at *10 (concluding that statements made by the plaintiff's supervisors referring to his heart condition did not demonstrate that he was "regarded as" disabled). Rothmel and Cook's email exchange demonstrates that they regarded Plaintiff as "somehow disabled" after he sustained a back injury in winter 2014, not that they believed that this back injury substantially limited any major life activity.

Further, it cannot be said that Defendants regarded Plaintiff as incapable of performing any job. Plaintiff has not put forth any evidence that Defendants viewed his back injury as limiting his ability to work in any position. The uncontested evidence shows that as of March 4, 2016, Plaintiff was "cure[d]," "pain free[,] and off all medications" following his winter 2014 fall. (Wilson Tr. Ex. 3.) Although O'Kane may have regarded Plaintiff as unable to lift heavy objects by himself after his March 2 warehouse injury, Defendants still regarded him as able to perform the duties of his position without any restriction. This injury, which did not prevent Plaintiff from returning to work on the same day without restrictions, was objectively "transitory and minor." Cf. Brearey v. Brennan, No. 17-cv-2108, 2019 WL 111037, at *8 (E.D. Pa. Jan. 4., 2019) (Goldberg, J.) (granting

---

also continued to cite Kelly with approval in post-ADAAA opinions. See, e.g., Koci v. Cent. City Optical Co., 69 F. Supp. 3d 483, 487 (E.D. Pa. 2014) (Dalzell, J.); Kiniropoulos v. Northampton Cty. Child Welfare Serv., 917 F. Supp. 2d 377, 386 (E.D. Pa. 2013) (Stengel, J.).

summary judgment on the plaintiff's discrimination claim where the plaintiff's broken ankle, which required him to stop reporting for duty and to use crutches for six to eight weeks, was objectively transitory and minor); Weisel v. Stericycle Commc'ns Sols., No. 3:13-cv-3003, 2015 WL 390954, at *11 (M.D. Pa. Jan. 28, 2015) (concluding that the plaintiff did not establish perceived disability where the impairment the defendant perceived was surgery with clearance to return to work two weeks later, which was objectively transitory and minor). As a result, Plaintiff raises no genuine issue of material fact that would permit a finding that Defendant regarded him as disabled.

### B. Failure to Accommodate Claims (Counts I and II)–Summary judgment is granted.

Plaintiff also alleges that Defendants "engaged in unlawful employment practices by failing to accommodate him" in violation of the ADA and PHRA. (Compl. ¶ 48.) Under the ADA, "'[a]dverse employment decisions' include refusing to make reasonable accommodations for a plaintiff's disabilities." Emmell v. Pheonixville Hosp. Co., LLC, 303 F. Supp. 3d 314, 328 (E.D. Pa. 2018) (Stengel, J.) (quoting Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010)). To prevail on a failure to accommodate claim, a plaintiff must establish "(1) the employer had adequate notice of the employee's disability; (2) the employee requested an accommodation; (3) the employer failed to make a good faith effort to assist the employee; and (4) the employee 'could have been reasonably accommodated but for the employer's lack of good faith.'" Kieffer v. CPR Restoration & Cleaning Serv., LLC, 200 F. Supp. 3d 520, 535 (E.D. Pa. 2016) (Beetlestone, J.), aff'd, 733 F. App'x 632 (3d Cir. 2018) (quoting Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246–47 (3d Cir. 2006)).

Here, Defendants argue that the record is devoid of any evidence that Plaintiff requested lighter duties after either medical leave, and that Plaintiff's request for a demotion and/or transfer

to Graybar's Florida facility cannot support a failure to accommodate claim because there were never openings for a Warehouse Lead position, nor were there vacancies in Florida, after Plaintiff's requests. (MSJ at 18.) Though Plaintiff argues that he requested a demotion to any position, not just to the position of warehouse lead, Plaintiff does not otherwise respond to Defendants' contentions. (See P's SOF ¶ 33.)

Nor does Plaintiff explain how a demotion in Philadelphia or transfer to Florida was an accommodation requested in connection with his back injury or his prostate cancer. Though Plaintiff alleges that he asked O'Kane about a demotion "two or three times over a period of two years" prior to his termination, Plaintiff does not allege when or why he made these requests. (Id.) The only request documented in the record was made in November 2015–before Plaintiff reported his back injury to Defendants. In a November 9, 2015 email from O'Kane to himself, O'Kane notes, "I met with Gyles today . . . . [W]e discussed the interest that Gyles had to become a warehouse lead in [Philadelphia, PA]. I explained to Gyles that we currently do not have an open Warehouse Lead position to put him in. Gyles explained that he's still looking into moving to Florida and working with the DO from that District regarding a position down there. He said that he'd be interested in any position (lead, material handler, etc.)." (MSJ Ex. E.) Although Plaintiff testified that he wanted to transfer to Florida to be closer to family after he was diagnosed with cancer, based on this November 2015 email, Plaintiff requested to transfer approximately nine months before he was diagnosed with cancer. (See Wilson Tr. at 140:13–25.)

Plaintiff further argues that the March 17, 2016 email exchange between Rothmel and Cook evidences that a demotion was an accommodation requested in connection with Plaintiff's back injury.[15] In this email communication, Rothmel writes to Cook, "I would still proceed

---

[15] The oral argument transcript will reveal further discussion on this issue.

cautiously in that [Plaintiff] was recently out on leave and could qualify as disabled. I would still move forward in formally engaging in an interactive process regarding accommodation." (Cook Tr. Ex. 36.) Later in the same email exchange, Rothmel writes to Cook, "I think that they should continue to work with [Plaintiff] and really try hard to help him succeed. In time, maybe there will be another non-supervisory position that he could do." (Id.) Though this email indicates that Plaintiff may have requested an accommodation for his back injury, no reasonable jury could infer from this communication that Defendants failed to make a good faith effort to assist Plaintiff, or that Plaintiff could have been reasonably accommodated but for Defendants' lack of good faith. Therefore, summary judgment will be granted in favor of Defendants on Plaintiff's failure to accommodate claims.

### C. Age Discrimination Claims (Counts VI and VII)–Summary judgment is granted.

Plaintiff also brings age discrimination claims under the ADEA (Count VI) and the PHRA (Count VII). The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, the PHRA makes it unlawful "[f]or any employer because of the . . . age . . . of any individual . . . to discharge from employment such individual . . . if the individual . . . is the best able and most competent to perform the services required." 43 Pa.C.S. § 955(a).

Because age discrimination claims under both statutes follow the McDonnell Douglas framework, the Court addresses both claims together. See Evanoski v. United Parcel Serv., Inc., 571 F. App'x 92, 95 n.2 (3d Cir. 2014) (quoting Fasold, 409 F.3d at 184 n.8) ("interpret[ing] the implicated provisions of the ADEA and PHRA as applying identically . . . and as being governed by the same set of decisional law"); see also Smith, 589 F.3d at 691 (approving of the "continued application of the McDonnell Douglas paradigm in age discrimination cases").

### i. Plaintiff has established a prima facie case of age discrimination.

To prevail on an age discrimination claim under the ADA or the PHRA, "a plaintiff must show that his . . . age 'actually motivated' or 'had a determinative influence on' the employer's adverse employment decision." Fasold, 409 F.3d at 183–84 (citations omitted); see also Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009) ("[A] plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action.")). A plaintiff can meet this burden by first establishing a prima facie case of age discrimination. Fasold, 409 F.3d at 184.

To state a prima facie case of age discrimination–the first step in the McDonnell Douglas framework–an employee must establish that "(1) he is forty years of age or older; (2) the employer took an adverse action against him; (3) he was qualified for the position at issue; and (4) he was ultimately replaced by another employee 'who was sufficiently younger to support an inference of discriminatory animus.'" Evanoski, 571 F. App'x at 95 (quoting Burton, 707 F.3d at 426).

Defendants contend that Plaintiff cannot establish a prima facie of age discrimination, but do not explain why. (MSJ at 29.) Contrary to Defendants' position, Plaintiff has established a prima facie case. First, Plaintiff was over forty years old when he was terminated in November 2016 at the age of fifty-five. (Compl. ¶ 40.) There is also no dispute that Plaintiff was qualified[16]

---

[16]     Though the parties do not dispute whether Plaintiff was qualified, the Court notes that judges in this District, including this Court, have concluded that an employee's repeated, admitted mistakes and violations of employer policies makes him unqualified to continue in the position. See Cridland v. Kmart Corp., 929 F. Supp. 2d 377, 387 (E.D. Pa. 2013) (Baylson, J.) (concluding that Plaintiff was not qualified due to "the volume of Defendant's evidence demonstrating Plaintiff's shortcomings as a Store Manager and the dearth of Plaintiff's evidence offered in support of his qualifications"); see also Bloch v. Mack Trucks, Inc., 240 F. Supp. 3d 365, 372 (E.D. Pa. 2017) (Schmehl, J.) ("An employee who is terminated for cause has not met

for his position or that he suffered an adverse employment action when he was terminated. And fourth, Plaintiff was replaced by a Warehouse Supervisor who, at twenty-five years old, was "sufficiently younger" than Plaintiff at the time of his termination. (See Pl.'s SOF ¶ 120); see also Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 307 (3d Cir. 2004) (citation and internal quotation marks omitted) ("[T]o satisfy the sufficiently younger standard, there is no particular age difference that must be shown, but . . . courts have held . . . that a five year difference can be sufficient [while] . . . a one year difference cannot."); see also Cridland, 929 F. Supp. 2d at 385 (concluding that employees who were nine and fourteen years younger than the plaintiff were "sufficiently younger").

---

the third element of the test for a prima facie case by showing that he was qualified for the position from which he was terminated.").

Here, the record reflects that Plaintiff had documented performance issues from July 2014 through November 2016. (Wilson Tr. Ex. 20.) Plaintiff also testified that he did not follow Graybar's policies in connection with the November 4, 2016 truck incident. (See Wilson Tr. at 101:2–11.)

However, Plaintiff has put forth sufficient evidence disputing his record of deficient performance after July 2014–the date of Plaintiff's first recorded performance issues. (Defs.' SOF ¶ 4). Namely, that Plaintiff earned merit-based pay increases on September 1, 2014; September 1, 2015; and September 1, 2016; that Plaintiff earned a certificate for completing Graybar's Management Training Program in November 2014; and that Plaintiff was awarded a "Safe Driver Award" from Graybar in 2015. (Resp. Ex. A; Cook Tr. Ex. 2). This evidence supports Plaintiff's qualifications for Warehouse Supervisor, the position to which Plaintiff was promoted ten years before his termination. See Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 268 (3d Cir. 2005) (holding that one's "satisfactory performance of duties, leading to a promotion, does establish a plaintiff's qualification for a job"); Briggs v. Temple Univ., 339 F. Supp. 3d 466, 488–89 (E.D. Pa. 2018) (Kelly, J.), appeal filed, No. 18-3530 (3d Cir. Nov. 20, 2018) (concluding that the plaintiff was qualified for the position from which she was terminated where she received annual evaluations stating that she was minimally qualified, and she had nearly ten years of experience employed in the position).

### ii. Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's termination.

As set forth above, if an employee establishes a prima facie case, as is the case here, "the burden of production (i.e., of going forward) shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision." Smith, 589 F.3d at 691. The Third Circuit has held that this burden is "'relatively light' and is satisfied if the employer provides evidence which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." Burton, 707 F.3d at 426 (quoting Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)).

Here, Defendants have met their "relatively light" burden. Defendants have explained that Plaintiff was terminated because, after documented performance issues, Plaintiff admittedly violated Graybar's Accident and Injury Investigation and Drug Testing Policies on November 4, 2016. (See Rep. at 2.) Though the parties dispute whether Plaintiff violated Graybar's policies by failing to timely report the incident and declining to immediately drug test O'Donnell, Plaintiff admitted in his deposition testimony that he failed to follow Graybar's Drug Testing Policy. It is also undisputed that Defendants conducted a verbal counseling session with Plaintiff in January 2015 and provided Plaintiff with at least one Written Notice. When O'Kane provided Plaintiff with the September 2015 Written Notice, he described his reasons for doing so, and they were not related to age. These justifications, taken as true, allow the conclusion that there was a non-discriminatory reason for Plaintiff's termination.

### iii. Plaintiff has not demonstrated pretext.

Finally, if the employer articulates a legitimate, non-discriminatory reason for the employee's termination, as Defendants have in this case, "the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action

is pretextual." <u>Smith</u>, 589 F.3d at 691. "To make a showing of pretext sufficient to defeat summary judgment, the employee 'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" <u>Evanoski</u>, 571 F. App'x at 95 (quoting <u>Burton</u>, 707 F.3d at 427).

Plaintiff contends that he was actually terminated because of his age, as Rothmel and Cook discussed Plaintiff's entitlement to a pension and retirement benefits if he were terminated before Plaintiff was considering retirement. (Resp. at 28.) According to Plaintiff, Defendants proffered reasons for terminating him are not credible because Plaintiff had a history of excellent performance until he began to age and suffer health problems. (<u>Id.</u>) The performance issues cited by Defendants, Plaintiff contends, are "relatively minor procedural items" that do not warrant termination. (<u>Id.</u>)

Defendants argue that Plaintiff has failed to establish pretext because Plaintiff testified that he failed to follow Graybar's procedures after the November 4, 2016 incident. (MSJ at 30.) Further, age was not a motivating factor in Defendants' decision to terminate Plaintiff, Defendants aver, because Plaintiff was promoted to the position of Warehouse Supervisor when he was forty-five years old, he received positive reviews from the time he was forty-five to fifty-five years old, and there is no evidence in the record that Defendants treated similarly situated persons who were under forty years old any differently. (<u>Id.</u> at 30–31.)

The Court concludes that Plaintiff has not met his burden, as there is no evidence that Defendants considered Plaintiff's age in the decision to terminate him. Plaintiff has failed to cite, and the Court is unaware of, any precedential judicial decisions suggesting that an employer's

discussion of an employee's ability to retire is evidence of pretext.  In fact, as Defendants note, the Third Circuit has held that "the mere offer of any early retirement program does not support an inference of discrimination." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1081 (3d Cir. 1992) (quoting Colgan v. Fisher Sci. Co., 935 F.2d 1407, 1422 (3d Cir. 1991)).  Nor has Plaintiff suggested that younger, similarly situated employees were treated more favorably.  The fact that Defendants cite "relatively minor procedural items" as the basis for Plaintiff's termination does not mean that Defendants' proffered reasons are pretext for age discrimination.  As a result, Plaintiff has failed to make a showing of pretext sufficient to survive summary judgment on his age discrimination claims.

### D. Retaliation Claims (Counts III and VIII)

Plaintiff also brings retaliation claims under two statutory frameworks—a workers' compensation retaliation claim under state law (Count III), and a retaliation claim under the FMLA (Count VIII).  The Court addresses each Count in turn.

### i. Workers' Compensation Retaliation Claim (Count III)–Summary judgment is granted.

Plaintiff alleges retaliation in violation of the PHRA, arguing that his termination amounted to retaliation for his requests for workers' compensation in March 2016.  In support of this claim, Plaintiff alleges that "[p]ublic policy in Pennsylvania prevents an employer from retaliating against an employee who seeks relief under the Workers Compensation Act" pursuant to Section 5 of the PHRA.  (Compl. ¶ 67.)  Though the PHRA does prohibit retaliation, it does not pertain to workers' compensation retaliation, and Plaintiff has not cited any judicial decisions to the contrary.  See Goodman v. Unity Twp., Pa., No. 2:03-CV-1650, 2006 WL 840339, at *6 n.3 (W.D. Pa. Mar. 30, 2006) (noting that "[w]orkers' compensation retaliation is not addressed by the . . . PHRA").

Accordingly, the Court construes Plaintiff's workers' compensation retaliation claim under the Workers' Compensation Act, not the PHRA.

The Pennsylvania Workers' Compensation Act, 77 Pa. Stat. Ann. § 1 et seq., "prohibits an employer from discharging an at-will employee in retaliation for filing a workers' compensation claim." Kieffer, 200 F. Supp. 3d at 539 (citing Shick v. Shirey Lumber, 716 A.2d 1231, 1237–38 (Pa. 1993)). Because courts in Pennsylvania have not delineated the elements of this claim, federal district courts have analogized workers' compensation retaliation claims to Title VII retaliatory discharge claims. Kieffer, 200 F. Supp. 3d at 539 (citing Spring v. Sealed Air Corp., 483 F. App'x 765, 768 (3d Cir. 2012); Stoutmire v. Gen. Elec. Co., No. 2001-925, 2004 WL 3141333 (Pa. D. & C. Sept. 21, 2004))). As a result, claims of retaliation for requesting workers' compensation are assessed under the McDonnell Douglas burden-shifting framework. Spring, 483 F. App'x at 768.

Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that "(1) he engaged in protected activity; (2) he suffered an adverse employment action either after or contemporaneous with the protected activity; and (3) a causal connection exists between his protected activity and the employer's adverse action." Kieffer, 200 F. Supp. 3d at 539 (citing Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003)); see also Daniels, 776 F.3d at 193 (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)).

If the plaintiff can make this showing, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." Daniels, 776 F.3d at 193 (quoting Marra, 497 F.3d at 300). If the employer advances a legitimate, non-retaliatory reason, "the burden shifts back to the plaintiff to demonstrate that 'the employer's

proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Daniels, 776 F.3d at 193 (quoting Marra, 497 F.3d at 300).[17]

Plaintiff has established that he engaged in a protected activity when he reported his injuries in March 2016. Plaintiff concedes that he did not file a workers' compensation claim in connection with his winter 2014 injury or his March 2, 2016 warehouse injury. However, the record reflects that Defendants viewed Plaintiff's SG-174 form dated March 4, 2016, which reported Plaintiff's winter 2014 injury, as a "2014 worker's comp claim," which was "denied due to reporting outside of the guidelines." (Cook Tr. Ex. 36.) With respect to Plaintiff's completion of an SG-174 form reporting his March 2, 2016 warehouse injury on March 3, 2016, the Third Circuit has viewed an employee's report of a work-related injury to his employer as a protected activity. See Spring, 483 F. App'x at 768 (considering whether the plaintiff demonstrated a causal connection between "his initiating a claim for workers' compensation (when he reported his work-related injury to his employer)" and his termination); but see Smith v. R.R. Donnelly & Sons Co., No. 10-1417, 2011 WL 4346340, at *6 (E.D. Pa. Sept. 16, 2011) (Tucker, J.) ("[I]t is not merely the employer's awareness of the work-related injury that evidences the plaintiff engaged in a protected activity. Rather, it is the reporting of the work-related injury in conjunction with the

---

[17] Plaintiff contends that Daniels does not require this Court to assess Plaintiff's claim under the McDonnell Douglas framework because Daniels involved a Title VII retaliation claim, not a workers' compensation retaliation action. (Resp. at 24.) However, the Third Circuit has applied the McDonnell Douglas framework used in Title VII retaliatory discharge actions to workers' compensation retaliation claims. See, e.g., Spring, 483 F. App'x at 768 ("The Pennsylvania courts have yet to enumerate the elements of a retaliatory discharge claim based on seeking workers' compensation benefits. As such, we will employ the familiar burden-shifting framework for a retaliatory discharge claim under Title VII."); see also Christman v. Cigas Mach. Shop, Inc., 293 F. Supp. 2d 538, 543 (E.D. Pa. 2003) (Pollak, J.) ("The Pennsylvania Supreme Court has not yet set forth the elements of a prima facie case of retaliatory discharge [under the Workers' Compensation Act], so courts in this district borrow the analytical structure used in Title VII retaliation claims.").

employee's intent to file a workers compensation claim that is enough to trigger the protection afforded by the [Workers' Compensation] Act.").

Plaintiff has also established the second element–that Plaintiff suffered an adverse employment action after the protected activity–as the record reflects the undisputed fact that Plaintiff was terminated on November 10, 2016. However, Plaintiff has offered no evidence from which a reasonable jury could infer a causal connection between his workers' compensation claims and his termination.

The Court considers "a broad array of evidence in determining whether a sufficient causal link exists to survive a motion for summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (citation and internal quotation marks omitted). If the temporal proximity between the alleged protected activity and the adverse employment action is "unusually suggestive," "it is sufficient standing alone to create an inference of causality and defeat summary judgment." Id. The Third Circuit has instructed that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months . . ., without more, cannot create an inference of causation and defeat summary judgment." Id. at 233.

Where temporal proximity is not "unusually suggestive," the Court must determine "whether the proffered evidence, looked at as a whole, may suffice to raise the inference" of causation. Id. at 232 (citation and internal quotation marks omitted). Relevant evidence includes "intervening antagonism or retaliatory animus, inconsistencies in the employer's reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus[,]" such as "the employer's treatment of other employees." Id. at 232–33; Theriault v. Dollar Gen., 336 F. App'x 172, 175 (3d Cir. 2009) (citing Marra, 597 F.3d at 302).

In this case, the temporal proximity between Plaintiff's March 2016 reports and his November 2016 termination, approximately eight months later, is not "unusually suggestive." See Theriault, 336 F. App'x at 175 (holding that plaintiff failed to establish causation in part "because she was terminated several months after her alleged protected activity"). Plaintiff has not offered additional evidence from which a reasonable jury could infer a causal connection.

Plaintiff claims that after his request for workers' compensation was denied, there was "constant communication" between Cook, O'Kane, and Rothmel discussing "terming" Plaintiff, his retirement, and how to "proceed with a plan of action" in light of the fact that Plaintiff could have qualified as disabled. (Resp. at 25.) Though Plaintiff alleges that there was "constant communication," Plaintiff cites to only one email exchange in the record—the March 17, 2016 email exchange between Cook and Rothmel. (Cook Tr. Ex. 36.) In that email, Cook and Rothmel do discuss Plaintiff's eligibility for termination and a "plan" considering Plaintiff's retirement. Cook notes that Plaintiff's workers' compensation claim was denied and asks, "With this information does that change anything or do we still keep with the course of action (meaning wait until mid-April to address on paper any performance issues) or does this allow us to be able to move forward with formally addressing?" (Id.)

However, in that same email, Rothmel suggests that Graybar intended to help Plaintiff improve, rather than terminate him. Rothmel writes, "I spoke with Julie about the retirement issue. She explained that, if terminated, [Plaintiff] would still receive his retirement benefit, but it would be significantly reduced than if he was [an] employee continuously before his retirement. Given that, I think that they should continue to work with him and really try hard to help him succeed. In time, maybe there will be another non-supervisory position that he could do." (Id.) (emphasis added.)

40

Alternatively, Plaintiff argues that there was temporal proximity between his March 3, 2016 injury report and a "flurry of write-ups." (Resp. at 25.) Plaintiff refers to the second Written Notice, on which O'Kane documented issues with Plaintiff's performance that took place on March 4, March 8, March 25, March 28, April 4, and April 5. (Id.) (citing O'Kane Tr. Ex. 31.)[18] Assuming that the write-ups are adverse employment decisions, Plaintiff ignores the performance issues documented prior to March 2016; namely, the issues that gave rise to the January 2015 management consultation and those described in the September 2015 Written Notice. The record is devoid of evidence from which a jury could reasonably infer that Plaintiff was terminated for seeking workers' compensation. Accordingly, summary judgment will be granted on Plaintiff's workers' compensation retaliation claim.

### ii. FMLA Claim (Count VIII)–Summary judgment is denied.

Plaintiff avers that Defendants retaliated against Plaintiff for exercising his right to take FMLA leave in August 2016 for cancer treatment by making increasing demands upon Plaintiff, assigning Plaintiff duties outside the scope of his employment, "verbally chastising" Plaintiff for his work, continually asking Plaintiff "if/when he would be transferring" to Florida, and terminating his employment. (Compl. ¶ 110.)

Under the FMLA, an eligible employee is entitled to a total of twelve workweeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); Bonkowski v. Oberg Indus., Inc., 787 F.3d 190, 195 (3d Cir. 2015). The United States Department of Labor ("DOL") has promulgated regulations to implement the FMLA. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 141–42 (3d Cir. 2004). Pursuant to DOL regulations, after an

---

[18] Plaintiff incorrectly cites Exhibit 31 to Cook's deposition transcript in the Response.

employee gives notice of the need to take FMLA leave, "when an employer possesses enough information to 'determine whether the leave is being taken for an FMLA-qualifying reason . . ., the employer must notify the employee whether the leave will be designated and counted as FMLA leave within five business days absent extenuating circumstances.'" Gunter v. Cambridge-Lee Indus., LLC, 186 F. Supp. 3d 440, 451 (E.D. Pa. 2016) (Stengel, J.) (quoting 29 C.F.R. § 825.300(d)(1)).

The FMLA makes it unlawful for an employer to "discriminat[e] or retaliat[e] against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). An employer violates the FMLA if it "use[s] the taking of FMLA leave as a negative factor in employment actions." Budhun, 765 F.3d at 258 (quoting 29 C.F.R. § 825.220(c)).

FMLA retaliation claims are also analyzed under the McDonnell-Douglas burden shifting framework. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012). Under this framework, a plaintiff must establish a prima facie case of FMLA retaliation by showing that "(1) []he invoked h[is] right to FMLA-qualifying leave, (2) []he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." Id. at 301–02.

Here, there is no dispute that the second element has been met, as Plaintiff suffered an adverse employment decision when he was terminated. However, the parties dispute the first and third elements–whether Plaintiff's second leave of absence qualified as FMLA leave, and whether Plaintiff's termination was causally related to his invocation of his right to FMLA-qualifying leave.

With respect to the first element, Defendants argue that Plaintiff had no right to FMLA-qualifying leave in August 2016 because he exhausted his leave entitlement with his fourteen-

week leave of absence from November 2015 to February 2016. (Rep. at 6–7.) Plaintiff, on the other hand, argues that his first leave of absence was not FMLA leave, and so his second leave of absence was FMLA-protected. (Resp. at 31.)

The Court concludes that there are genuine disputes over material fact over the first element of Plaintiff's prima facie case–whether Plaintiff invoked his right to FMLA-qualifying leave when he requested and took leave in August 2016. Though Plaintiff contends that it is immaterial whether Plaintiff's first leave of absence was FMLA-protected by arguing that he was terminated for both leaves of absence regardless of which was designated as FMLA leave, judges in this District have concluded that a plaintiff cannot state a FMLA retaliation claim if his leave was not FMLA-protected. See Karaffa v. Montgomery Twp., No. 12-1184, 2013 WL 1157626, at *6 (E.D. Pa. Mar. 21, 2013) (Sanchez, J.) (granting summary judgment on the plaintiff's FMLA retaliation claim because "[the plaintiff's] leave was not protected by the FMLA because [she] had already exhausted her 12 weeks of leave[,]" and so "[her] request for, and taking of leave . . . d[id] not constitute an exercise of her FMLA rights, and any alleged discrimination for taking such leave d[id] not violate the FMLA").

The parties also dispute whether Defendants viewed Plaintiff's first leave of absence as FMLA leave. Plaintiff contends that Defendants failed to treat his first leave of absence as FMLA leave because they attempted to terminate him during his leave. Specifically, Plaintiff cites a replacement/termination form as evidence that Defendants intended to terminate Plaintiff as early as January 9, 2016–eight weeks into Plaintiff's fourteen-week leave. (Resp. at 31.) However, the form appears to undermine Plaintiff's proposition that Defendants did not view his leave of absence as FMLA leave, as O'Kane indicated on the form that the reason for Plaintiff's termination/replacement was that he "did not return to work following FMLA leave." (Cook Tr.

Ex. 34.)  The record evidence also indicates that the final approval on the form–that of Harvey, the "DVP"–was not granted until February 11, 2016, after Plaintiff had allegedly exhausted his leave entitlement.  (Cook Tr. Ex. 34.)  Though Harvey wrote in a February 11 email that the form "was signed in January by all parties," there is no evidence in the record that Defendants attempted to terminate Plaintiff before he had allegedly exhausted his twelve-week FMLA leave entitlement. (See id.)  O'Kane waited until February 3, 2016–twelve weeks into Plaintiff's leave–to ask Cook if they could meet to discuss Plaintiff, and until February 8, 2016–thirteen weeks into Plaintiff's leave–to ask Cook if he could submit the form to terminate and replace Plaintiff.  (Id.)

Assuming Plaintiff's first leave was FMLA-protected, Defendants were permitted to terminate Plaintiff as of February 3, 2016.  See Fleck v. Wilmac Corp., No. 10-05562, 2012 WL 1033472, at *15 (E.D. Pa. Mar. 27, 2012) (Buckwalter, J.) (quoting Keim v. Nat'l R.R. Passenger Corp., No. 05-CV-4338, 2007 WL 2155656, at *6 (E.D. Pa. July 26, 2007) (Davis, J.) ("[O]nce an employee exceeds the duration of h[is] protected leave, the employer is not obligated by [the] FMLA to keep open the position or to reinstate the employee upon h[is] return.")).  Plaintiff has not cited any precedential judicial authority indicating that an employer's discussion of terminating an employee during or after his leave is relevant to whether the leave was FMLA-protected.

The record also reflects that Plaintiff viewed his absence as FMLA leave, despite Plaintiff's arguments that his first leave of absence was never designated as FMLA leave.  For example, the Second Amended Complaint alleges that in August 2016, "Plaintiff was eventually given time off under the FMLA [even though Defendants claimed that he exhausted his FMLA leave], but was only given limited time rather than the full amount of leave that he was entitled to. . . .  Despite complications from surgery, Plaintiff only used eight weeks in an effort to appease the Defendants, though he was entitled to take more pursuant to his rights under the FMLA."  (Compl. ¶ 109.)  In

Plaintiff's Sur-Reply, Plaintiff argues that he is bringing an FMLA retaliation claim based on both leaves of absence, suggesting that his first leave was FMLA-protected.  (See Sur-Rep. at 1.)

In light of these disputed facts, the Court cannot conclude, as a matter of law, that Plaintiff invoked his right to FMLA-qualifying leave when he requested and took leave in August 2016. Because there are genuine disputes of material fact concerning the first element of Plaintiff's prima facie case, the Court need not discuss the remaining elements or the subsequent steps of the burden-shifting framework.  Summary judgment will be denied on Plaintiff's FMLA retaliation claim.,

### E.  Wrongful Discharge Claim (Count X)–Summary judgment is granted.

Finally, Plaintiff brings a common law wrongful discharge claim.  Under Pennsylvania law, an at-will employee may be terminated at any time and for any or no reason.  Geary v. U.S. Steel Corp., 319 A.2d 174, 176 (Pa. 1974).  The Pennsylvania Supreme Court has recognized a "very limited exception" to this rule, which "afford[s] terminated employees a judge-made cause of action for wrongful termination only in the rare case where the termination violates 'a clear mandate of [Pennsylvania] public policy.'"  Kent v. Keystone Human Servs., 68 F. Supp. 3d 565, 568 (M.D. Pa. 2014) (quoting McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 286 (Pa. 2000); see also Weaver v. Harpster, 975 A.2d 555, 563 (Pa. 2009) (noting that termination violates public policy "[o]nly in the clearest of cases").  Pennsylvania courts have recognized discrimination as one such exception.  Lantz v. Hosp. of Univ. of Pa., No. 96-2671, 1996 WL 442795, at *5 (E.D. Pa. July 30, 1996) (Bechtle, J.) (citing Jacques v. AKZO Int'l Salt, Inc., 619 A.2d 748, 751 (Pa. Super. Ct. 1993)).

More recently, however, the Pennsylvania Supreme Court has suggested that an exception to the at-will employee doctrine based on public policy violations is contrary to the PHRA's legislative intent.  Weaver, 975 A.2d at 567 n.10 ("To create an exception to the at-will

employment doctrine . . . despite a legislative enactment that preempts common law causes of action for unlawful discrimination, is contrary to the intended exclusivity of the PHRA."); see also Brennan v. Nat'l Tel. Directory Corp., 850 F. Supp. 331, 344 (E.D. Pa. 1994) (Joyner, J.) ("[T]he PHRA preempts parties from bringing common law claims for wrongful discharge based on claims of discrimination because the remedies of [the] PHRA are exclusive.").

Defendants contend that this claim should be dismissed because it is preempted by existing statutory remedies; namely, the ADA, PHRA, ADEA, and Title VII. (MSJ at 38.) According to Defendants, the PHRA is Plaintiff's exclusive remedy to recover on a wrongful discharge claim. (Id. at 39.) Plaintiff, on the other hand, argues that the wrongful discharge claim is not preempted, referencing the Court's Opinion denying Defendants' partial Motion to Dismiss this claim. (Resp. at 33–34.)

The Court finds Defendants' argument persuasive and concludes that Plaintiff's wrongful discharge claim must be dismissed. Even though Defendants seek to dismiss Plaintiff's PHRA claims, "[i]t is the existence of a remedy, not the success of a claim, that determines preemption. Therefore, if a plaintiff fails to pursue the available remedies, he is nonetheless barred." Lantz, 1996 WL 442795, at *5 (citing Jacques, 619 A.2d at 753); see also Clay v. Advanced Comput. Applications, Inc., 559 A.2d 917, 919 (Pa. 1989) ("[I]nasmuch as appellees failed to pursue their exclusive statutory remedy for sexual harassment and discrimination in the workplace, they are precluded from relief."). Moreover, judges within this Circuit have also noted that the FMLA preempts wrongful discharge claims. See, e.g., Engle v. Milton Hershey Sch., No. 1:06-cv-0109, 2007 WL 1365916, at *7 (M.D. Pa. Jan. 19, 2007) (dismissing plaintiff's wrongful discharge claim as preempted, and noting that the plaintiff "d[id] not dispute that wrongful-discharge claims predicated upon injuries that can be remedied under the PHRA, ADA, or FMLA would be

preempted"). Therefore, summary judgment will be granted on Plaintiff's wrongful discharge claim.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied as to Plaintiff's ADA discrimination claim (Count I) and FMLA retaliation claim (Count VIII), and granted as to Plaintiff's disability discrimination claim under the PHRA (Count II), failure to accommodate claims in Counts I and II, workers' compensation retaliation claim (Count III), age discrimination claims (Counts VI and VII), and wrongful discharge claim (Count X).

An appropriate Order follows.

O:\CIVIL 17\17-3701 Wilson v Graybar Electric\17cv3701 Memorandum re MSJ.docx